|  |  |  |
|---|---|---|
| ARNOLD PEOPLES and J.P., | ) | |
| by her father and next friend, | ) | |
| ARNOLD PEOPLES, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 19-cv-00568 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| OSWEGO COMMUNITY SCHOOL | ) | |
| DISTRICT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Arnold Peoples brings this case on behalf of his daughter, J.P.,[1] after she was strip searched at her elementary school.[2] R. 19, Am. Compl.[3] Peoples is alleging both federal and state law violations against Oswego Community School District and four of its employees—school nurse Dinah Meyers, teacher Tiffani Simmons, social worker Christine Nelson, and assistant principal Alex Gonzalez. The Illinois Department of Children and Family Services and one of its investigators, Imara Negron, are also named as defendants. Peoples brings a variety of claims for violations of J.P.'s First and Fourth Amendment rights, as well as state law claims for intentional infliction of emotional distress, intrusion upon seclusion, battery, and false imprisonment.

---

[1]Although Peoples actually sets out his daughter's full name in the Amended Complaint, the Federal Rules of Civil Procedure require that minors be referred to only by their initials. Fed. R. Civ. P. 5.2(a)(3). So, this Opinion will refer to Peoples' daughter as "J.P."

[2]This Court has subject matter jurisdiction over the § 1983 claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

[3]Citations to the record are noted as "R." followed by the docket number.

Peoples also asserts First Amendment and emotional-distress claims on his own behalf. All of the defendants have moved to dismiss the claims. For the reasons discussed below, the DCFS Defendants' motion to dismiss is granted, while the Oswego Defendants' motion to dismiss is denied.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Because Peoples was proceeding in a quasi-*pro se* manner at the time of filing, the Complaint is entitled to liberal construction. *Id*. To provide some context, in 2017, Arnold Peoples' daughter J.P. was a student at Long Beach Elementary School in the Oswego Community School District. Am. Compl. ¶¶ 2-3. At the time of the relevant events, J.P. was seven or eight years old.[4]

Starting in March 2017, Peoples emailed, called, and met with various School District employees about his concerns that J.P. was being bullied and treated unfairly at school. Am. Compl. ¶ 10. According to Peoples, the School District employees determined that he "was a hindrance and an annoyance to them, lacked what they approved of as parenting skills, and was an unfit parent." *Id*. ¶ 11.

On January 29, 2018, Oswego teacher Tiffani Simmons, social worker Christine Nelson, and assistant principal Alex Gonzalez allegedly called the Illinois Department of Children and Family Services (commonly known as "DCFS") to report

---

[4]When the Amended Complaint was filed in April 2019, J.P. was allegedly nine years old. Am. Compl. ¶ 2. So, because the relevant events happened in January and February 2018, the Court infers that J.P. was around seven or eight years old.

that Peoples had struck his daughter in the mouth. Am. Compl. ¶ 12. According to Peoples, the school employees had not actually observed any injuries on J.P., and the complaint was based only on "hearsay information." *Id*. Then, when DCFS apparently did not respond, Simmons, Nelson, and Gonzalez tried again the next day, on January 30. *Id*. ¶ 14. This time they called DCFS and "communicated falsely … based on hearsay information," that Peoples had struck his daughter "thirty times." *Id*.

After that second call, on January 31, 2018, DCFS sent one of its investigators, Imara Negron, to investigate the accusations. Am. Compl. ¶ 15. At the elementary school, Negron met with Simmons, Nelson, and the school nurse, Dinah Meyers. *Id*. Negron, Meyers, and Gonzalez decided to strip search J.P. *Id*. ¶ 16. According to Peoples, Negron and Meyers escorted J.P. into a school bathroom and removed her clothes to expose "intimate body areas despite the protestations of [J.P.] against being taken into the bathroom and against the removal of her clothing." *Id*. While this was happening, Negron allegedly "used her personal camera to take photos of [J.P.'s] disrobed, intimate body areas in violation of DCFS rules and regulations[,] which required her to use only DCFS photographic equipment." *Id*. ¶ 18. The Defendants did not contact Peoples before examining his daughter. *Id*. ¶ 17.

At some point on that same day, Negron visited Peoples' home, where she left her business card. Am. Compl. ¶ 19. Later, Peoples called Negron and arranged to meet with her on February 2, 2018. *Id*. Finally, on February 1, 2018, Gonzalez allegedly urged Negron to take protective custody of J.P., but Negron refused because

she determined that J.P. "had not been harmed and was not in danger of being harmed" by Peoples. *Id.* ¶ 20.

According to Peoples, this whole ordeal caused J.P. to suffer severe emotional distress, for which she continues to receive medical treatment. Am. Compl. ¶ 22.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[5] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

As a threshold matter, Peoples now acknowledges that the Illinois Department of Children and Family Services and the Oswego Community School District are not proper defendants in this lawsuit. The Eleventh Amendment bars lawsuits against states and state agencies, including DCFS, for monetary damages. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989). Indeed, the states and their agencies are not even considered "persons" that are suable under 42 U.S.C. § 1983. *Id.* at 71. So any claims against DCFS are dismissed with prejudice. This dismissal does not extend to Negron herself, however, because she is being sued in her individual capacity, not in her official capacity. *See Luder v. Endicott*, 253 F.3d 1020, 1022 (7th Cir. 2001).

With regard to the School District, Peoples proposes to file an amended complaint replacing the School District with the Oswego Community School District Board of Education, which would be a proper defendant under these circumstances.[6] R. 49, Pl.'s Resp. Br. at 6. There is no need to do so. It is clear that Peoples intended

---

[6]As Defendants point out, a school district is merely a geographical area. R. 30, Oswego Br. at 5 (citing *Cooney v. Soc'y of Mount Carmel*, 389 N.E.2d 549, 551 (Ill. 1979)). Accordingly, Defendants argue that a school district lacks the capacity to be sued unless authorized by statute. *Bd. of Educ. of Bremen High Sch. Dist. No. 228 v. Mitchell*, 899 N.E.2d 1160, 1162 (Ill. App. Ct. 2008). And here, the Illinois School Code provides the right to sue a school district's *board of education*. *Id.* at 1166 (citing 105 ILCS 5/10-2) (emphasis added). In any event, Peoples has voluntarily dismissed the School District.

to sue the Board, so the Court will go ahead and construe the suit against the School District as a suit against the Board.[7] But that being said, all claims against the Board are still dismissed because Peoples has failed to allege that the conduct at issue in this case was caused by any official policy or custom of the Board for purposes of establishing a *Monell* violation.[8] *See Teesdale v. City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012). This dismissal is without prejudice, though, in case Peoples believes he can identify a *Monell* policy or custom.

With that, the Court will now turn to the claims against the individual defendants—Meyers, Simmons, Nelson, and Gonzalez (together, the Oswego Defendants); and Negron, the DCFS investigator.[9]

## A. Fourth Amendment (Count 1)

First, Peoples argues that the strip search and photographing of J.P. constituted an unreasonable search and seizure in violation of J.P.'s Fourth Amendment rights. Am. Compl. ¶ 45. The public-school context is subject to a somewhat lower standard of Fourth Amendment scrutiny than the typical law-

---

[7] The amendment route (which could include addressing statute of limitations and relation back issues) would just needlessly prolong the process, especially in light of the fact that the *Monell* claims against the Board are being dismissed anyway.

[8] Under *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), a plaintiff suing a municipality or comparable entity (like a school board) must demonstrate that the entity's official policy, widespread custom, or action by an official with policy-making authority was the "moving force" behind the constitutional injury. *See Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016).

[9] It is true that the counts alleged in the Complaint are mostly barebones. For instance, under each count, Peoples simply realleges all previous paragraphs instead of naming the specific Defendants against whom the count is brought. But for now, in the spirit of construing the Complaint liberally, the Court will go ahead and treat each count as if all of the individual Defendants were named. But going forward, Peoples is advised that he will need to be much more precise in terms of identifying the specific roles of specific individuals in order to survive any future motions.

enforcement case (for instance, neither probable cause nor a warrant is necessarily required for public school administrators to search a student in school). *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009). But that does not mean that public school students are offered no Fourth Amendment protections at all. Instead, school searches are governed by a reasonable suspicion standard. *Id.* In general, "the measures adopted [must be] reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985). When applied to the specific context of strip searches, however, the Supreme Court has explained that the "categorically extreme intrusiveness" of a strip search "requires some justification in suspected facts." *Safford*, 557 U.S. at 376. In other words, given the "degree of intrusion" that a strip search entails, "general background possibilities fall short; a reasonable search *that* extensive calls for suspicion that it will pay off." *Id.* (emphasis added).

Here, there is no dispute that an extremely intrusive strip search of a seven- or eight-year-old girl has been alleged, so the only question is whether Peoples has adequately alleged that the Defendants did not have reasonable suspicion to justify that search.[10]

---

[10]To be clear, the precise question here is whether the strip search of J.P. was reasonable under the Fourth Amendment. The other actions (such as reporting Peoples to DCFS) do not constitute searches or seizures for purposes of the Fourth Amendment and will instead be addressed under the First Amendment claim below.

## 1. Oswego Defendants

Peoples argues that the Oswego Defendants instigated the DCFS investigation (and ensuing strip search) based on "hearsay and a false hearsay report" to DCFS.[11] Pl.'s Resp. Br. at 11. Specifically, Peoples alleges that the Oswego Defendants reached out to DCFS on three separate occasions: (1) the January 29, 2018 telephone call reporting that Peoples had struck J.P. in the mouth; (2) the January 30 call reporting that Peoples had struck J.P. thirty times, which then led to J.P. being strip searched in school as part of the ensuing DCFS investigation; and finally, (3) the February 1, 2018 communication from Gonzalez urging Negron to take protective custody of J.P. Am. Compl. ¶¶ 12-20.

It is a close call, but the Court concludes that Peoples has adequately alleged that the Oswego Defendants *did not* have reasonable suspicion to instigate the strip search. According to Peoples, the first phone call to DCFS was made based "on hearsay information and without observing any injury" to J.P. Am. Compl. ¶ 12. The second call was also based on "hearsay information" and was made in an "attempt to terminate even temporarily [Peoples'] custodial relationship" with J.P. *Id.* ¶ 14. With regard to this second call, the exact allegation is that the Oswego Defendants "communicated falsely to DCFS that, based on hearsay information," Peoples had

---

[11]Although only Meyers, the school nurse, was alleged to have personally participated in the strip search, Am. Compl. ¶ 16, Peoples does allege that all four of the Oswego Defendants met with Negron shortly before the strip search, and at least Gonzalez and Meyers are alleged to have "decided" to strip search J.P. *Id.* ¶¶ 15-16. So, for purposes of the pleading stage, and because Peoples was acting *pro se* at the time, Peoples has adequately alleged that all four were in on the broader scheme to initiate the strip search of J.P. and to retaliate against Peoples by initiating a DCFS investigation against him.

struck J.P. thirty times. It is not entirely clear if the "communicated falsely" phrase means that the hearsay information itself was false, or that Defendants lied about having heard any information at all. More generally, it is also not entirely clear what the "hearsay" information was. For instance, did the Oswego Defendants receive a tip from a different school administrator, or from a student, or from some other source—and if they did, what was said?

If the only allegation here were that the Oswego Defendants relied on "hearsay" when they decided to strip search J.P., then that fact standing alone might not be enough to allege that the Defendants lacked reasonable suspicion. School administrators, like police officers, very often rely on "hearsay" information for probable cause or reasonable suspicion, and there is nothing wrong with that. So, just looking at the first two phone calls alone (both of which were supposedly based on hearsay), there is probably not enough to conclude that the Oswego Defendants did anything improper.

But the allegations against the Oswego Defendants go farther than that. Specifically, Peoples alleges a *third* instance of communication between the Oswego Defendants and DCFS, in which Gonzalez "continued to urge" Negron to take J.P. into protective custody the day *after* J.P. had been strip searched, and the strip search had presumably revealed no evidence of physical abuse. Am. Compl. ¶ 20. And indeed, Negron refused to take protective custody at that point because she determined that J.P. had not been harmed and was not in danger of being harmed. *Id*. On this third instance, then, unlike with the previous two phone calls, there is no allegation that

the Oswego Defendants even relied on "hearsay." Instead, the implication is that they were given first-hand evidence (via the strip search and home visit) that J.P. had not been physically abused by her father, and yet they still urged Negron to take J.P. into protective custody. According to Peoples, all of this suggests that the Oswego Defendants never really suspected J.P. was in danger, even back when they made the first two phone calls. Rather, they allegedly initiated the DCFS investigation for different, retaliatory motives—namely, the Oswego Defendants became aware of Peoples' frequent complaints to the school about bullying and "then determined that [Peoples] was a hindrance and an annoyance to them, lacked what they approved of as parenting skills, and was an unfit parent for [J.P.]." *Id.* ¶ 11.

To repeat, this is a close call, but looking at all of the allegations together, it becomes plausible to read a retaliatory motive into all three phone calls to DCFS. Specifically, the fact that the Oswego Defendants continued to urge DCFS action toward J.P. despite the investigator's negative findings during the strip search and home visit casts doubt on the legitimacy of their motives for the earlier January 29 and January 30 phone calls that led to the strip search itself. Thus, Peoples has adequately alleged (but just barely) that the Oswego Defendants instigated the strip search without any reasonable suspicion of actual abuse. Of course, it is entirely possible that discovery will reveal that the Oswego Defendants did actually have sufficient suspicion to call DCFS and instigate the strip search of J.P. At this pleading stage, though, enough has been alleged for the Fourth Amendment claim to survive a dismissal motion.

But even if the search was unreasonable, the Oswego Defendants argue, they are nonetheless entitled to qualified immunity. Oswego Br. at 7. "A school official searching a student is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Safford*, 557 U.S. at 377 (cleaned up). The determination of whether a right was "clearly established" at the time of an official action must be assessed in a "particularized" sense, rather than "at a high level of generality." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (cleaned up). As the Supreme Court explained in *Safford*, however, "there is no need that the very action in question have previously been held unlawful." *Safford*, 557 U.S. at 377 (cleaned up). Outrageous conduct will obviously be unconstitutional. *Id*. And "even as to action less than an outrage, officials can still be on notice that their conduct violates established law…in novel factual circumstances." *Id*. (cleaned up).

Here, *Safford* clearly established that in-school strip searches are considered categorically intrusive and thus can only be justified by "suspected facts," and not just "general background possibilities." *Safford*, 557 U.S. at 376. That is true even when the government interest is strong—after all, the search in *Safford* was motivated by drug safety concerns. To be fair, the facts of this case do not perfectly align with the facts of *Safford*. Most notably, the government interests at stake are different; here, the search of the child was ostensibly triggered by a motivation to protect the child from abuse, as opposed to find evidence of wrongdoing *against* the child. But "there does not have to be a case directly on point" as long as "existing precedent [places] the lawfulness of the particular [action] beyond debate." *District of*

*Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (cleaned up). And in this instance, the search of J.P. went far beyond the already-intrusive search deemed unreasonable in *Safford*. Whereas the *Safford* student was forced to "pull out" her undergarments, "exposing her breasts and pelvic area to some degree," J.P. had her clothes removed from her by Negron and Meyers for at least long enough to be photographed by Negron. Am. Compl. ¶ 16. The law is clear that such an intrusive search requires "justification in suspected facts," which was absent here—at least based on the allegations as this Court has expansively read them.[12] *Safford*, 557 U.S. at 376. Thus, the Oswego Defendants are not entitled to qualified immunity at the pleading stage (summary judgment might be a very different story). The Fourth Amendment claims survive.

## 2. DCFS Investigator Negron

Negron, in contrast, did have sufficient reasonable suspicion to justify the search, even reading the Amended Complaint in Peoples' favor. The Amended Complaint makes clear that Negron was "directed" by her employer, DCFS, to conduct the investigation into Peoples only *after* the Oswego Defendants had called

---

[12]Defendants cite *Tyagi* for the proposition that there is no clearly established law on the reasonableness of in-school searches in the child abuse investigation context. Oswego Br. at 9 (citing *Tyagi v. Sheldon*, 2017 WL 4130532, at *16 (N.D. Ill. Sept. 18, 2017)). In *Tyagi*, the court noted that the plaintiffs "may very well have stated a Fourth Amendment claim" where social workers "performed a visual inspection of [the student]'s body without parental consent and with allegedly limited evidence giving rise to a reasonable suspicion of imminent danger of abuse," just like in this case. *Tyagi*, 2017 WL 4130532 at *16. But the court proceeded to hold that qualified immunity applied because "the reasonableness of such a search at public school is not clearly established under Seventh Circuit law." *Id*. But *Tyagi* did not mention *Safford* at all, and in the Court's view, *Safford* controls here. So the Court declines to follow the example of *Tyagi*.

DCFS to report suspected abuse. Am. Compl. ¶ 15. And when Negron arrived at Long Beach Elementary School, she "conferred" with Meyers, the school nurse, and Gonzalez, the assistant principal, before deciding to conduct the strip search of J.P. *Id*. ¶ 16. There is nothing in the Amended Complaint to suggest that Negron should not have relied on the representations of the two school administrators—Peoples does not allege, for instance, that these employees had made false accusations to DCFS in the past, nor does he suggest that Negron was somehow aware of the retaliatory motive of the Oswego Defendants. Indeed, Peoples concedes that Negron was *not* aware of the "falsity" of the accusations made by the Oswego Defendants. Pl.'s Resp. Br. at 11. So, even if the accusations turned out to be unfounded *later*, it was not unreasonable for Negron at the time to rely on the statements of the school employees and conduct the search.[13]

It is worth noting (although Peoples does not focus on this) that Negron arguably crossed a Fourth Amendment line by photographing J.P. while she was undressed. At the same time, however, it is not clearly established that a DCFS investigator, during the course of an investigation, is prohibited from documenting that injuries are not present on a child's body. So even if the photographing constituted an unreasonable search (or violated some other privacy right), Negron would be entitled to qualified immunity on that point. So, the Fourth Amendment claim against Negron is dismissed.

---

[13]Perhaps there is a separate, broader question of whether, in the context of child abuse investigations, it is ever reasonable under *Safford* and *T.L.O.* for investigators to rely solely on the word of school administrators in conducting an in-school strip search. But that is not really the question before the Court right now.

## B. First Amendment (Counts 2 and 7)

Peoples next argues that the Defendants violated the First Amendment by retaliating against him for his exercise of free speech. Am. Compl. ¶¶ 69, 200. Peoples also brings this claim on behalf of his daughter, arguing that Defendants' retaliation against him for his exercise of speech "has placed [J.P.] in fear of exercising free speech and petitioning the government." *Id*. ¶ 69. In order to state a First Amendment retaliation claim, Peoples must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Novoselsky v. Brown*, 822 F.3d 342, 354 (7th Cir. 2016).

Before delving into the substance of the First Amendment arguments, the Court notes that Peoples has entirely failed to allege that *J.P.*—as distinct from Peoples himself—engaged in any sort of protected First Amendment activity. Indeed, Peoples appears to frame J.P.'s First Amendment claim as stemming from Defendants' retaliation against Peoples' *own* speech, which in turn placed J.P. "in fear of exercising free speech." Am. Compl. ¶ 69. That is not a viable First Amendment retaliation claim, so the claim on behalf of J.P. is dismissed.

### 1. Oswego Defendants

Even so, Peoples has adequately stated a First Amendment claim on his *own* behalf. Peoples alleges that he called, emailed, and met with numerous Oswego school officials about his concerns that his daughter was being bullied and treated unfairly

at school. Am. Compl. ¶ 10. This is sufficient to establish the first element, namely, that Peoples engaged in protected activity. Peoples then alleges that, at some point, the Oswego Defendants became aware of his frequent complaints and "determined that [Peoples] was a hindrance and an annoyance to them, lacked what they approved of as parenting skills, and was an unfit parent for [J.P.]." *Id.* ¶ 11. After that, the Oswego Defendants reached out to DCFS on three separate instances: (1) the January 29, 2018 telephone call reporting that Peoples had struck J.P. in the mouth; (2) the January 30, 2018 telephone call reporting that Peoples had struck J.P. thirty times, which then led to J.P. being strip searched in school as part of the ensuing DCFS investigation; and finally, (3) the February 1, 2018 communication from Gonzalez to Negron urging Negron to take protective custody of J.P., even after the January 30 strip search had presumably revealed no results of abuse. *Id.* ¶¶ 12-20.

Although it is once again a close call, Peoples has alleged just enough for purposes of the pleading stage to plausibly suggest that the Oswego Defendants called DCFS on him because they were annoyed with his complaints about bullying, and not because they genuinely suspected abuse. As explained earlier, the "hearsay" rationale animating the first and second phone calls might not be enough standing alone to suggest a retaliatory motive. But when combined with Peoples' allegations that Gonzalez continued urging Negron to take custody of J.P. even after the strip search and home visit had revealed no evidence of physical abuse, then the retaliatory motive described by Peoples becomes plausible. In other words, this February 1

interaction between Gonzalez and Negron casts doubt on the legitimacy of the January 29 and January 30 phone calls as well.

In response, the Oswego Defendants argue that the First Amendment claim should be dismissed because Peoples' complaints to the school—which involved a purely personal dispute about the treatment of his daughter—did not touch on a matter of public concern. Oswego Br. at 12. This mixes apples with oranges. The public-concern requirement for retaliation cases was developed for a specific context only, namely, public *employment* cases. *See Connick v. Myers*, 461 U.S. 138, 140 (1983) (explaining that the government's interests as an employer in regulating the speech of its employees differ significantly from its interests in regulating the speech of people generally). Outside of the public employment context, however, there is no equivalent rationale for any public-concern requirement. There is no question that Peoples was engaging in protected First Amendment speech when he lodged complaints about his daughter being bullying to the school.

Finally, the Oswego Defendants again argue that they are entitled to qualified immunity.[14] Oswego Br. at 12. In support, they point to the "mandatory reporter" provision of the Illinois Abused and Neglected Child Reporting Act. *Id*. (citing 325 ILCS 5/1 *et seq*.). Under the Reporting Act, school personnel are considered mandatory reporters, which means they are required by law to "immediately report" to the DCFS hotline if they have "reasonable cause to believe a child known to them

---

[14]They also argue that "freedom from retaliation for making personal statements to school personnel is not a clearly established constitutional right." Oswego Br. at 12. As mentioned above, though, this attempt to draw a distinction between statements of public concern and statements of private concern for retaliation claims is just wrong.

in their professional or individual capacity may be an abused child or a neglected child." 325 ILCS 5/4. According to the Oswego Defendants, they had received information that Peoples hit J.P., so they were simply following this reporting mandate. Oswego Br. at 12. It was not clearly established, they argue, that calling DCFS under those circumstances would be unlawful. *Id*. But the problem is that Peoples has alleged that the Oswego Defendants did *not* have "reasonable cause" or suspicion to report him to DCFS. And at the pleading stage, the Court must accept Peoples' allegations as true. So the relevant question is not whether the Oswego Defendants violated a clearly established right when they called DCFS after receiving a reliable tip that Peoples had struck his daughter. Rather, the relevant question is whether they violated a clearly established right when they lodged multiple *bad faith*, retaliatory reports to DCFS. The latter conduct is certainly not called for by the mandatory reporting provisions of the Reporting Act.

In sum, Peoples' right to be free from retaliation for exercising his First Amendment rights was clearly established at the time of this case, and a reasonable official in the position of the Oswego Defendants would have understood that filing a child abuse report without reasonable suspicion, and in retaliation against a parent's complaints about bullying, would violate the First Amendment. Thus, Peoples has adequately stated a First Amendment retaliation claim (on his own behalf) against the Oswego Defendants.

## 2. DCFS Investigator Negron

That retaliatory motive, however, is completely absent from the allegations against Negron. The gist of Peoples' complaint against Negron is that she conducted the strip search and took photographs of J.P. without Peoples' consent or knowledge. But there is no suggestion that Negron performed either of those acts in order to retaliate against Peoples for his decision to complain to the school. In fact, there is no hint in the Amended Complaint that Negron was even aware of any complaints that Peoples had made, or of the presumably acrimonious history between Peoples and the school. Instead, the Amended Complaint makes clear that Negron was "directed" by her employer, DCFS, to conduct the investigation into Peoples only after the Oswego Defendants had called DCFS to report suspected abuse. Am. Compl. ¶ 15. And when Negron arrived at Long Beach Elementary School, she "conferred" with Meyers and Gonzalez before deciding to conduct a strip search of J.P. *Id*. ¶ 16. As explained above, there is nothing in the Amended Complaint to suggest that Negron should not have relied on the representations of the two school administrators. Absent any allegation that Negron's conduct was at all motivated by Peoples' speech, the First Amendment claim against Negron is dismissed.

## C. Emotional Distress (Counts 3 and 8)

Turning to the state law claims, Peoples first argues that the Defendants' "conduct" was "extreme and outrageous" and that the Defendants "intended to cause or recklessly or consciously disregarded the probability of causing emotional distress." Am. Compl. ¶¶ 93-94, 223-224. Peoples asserts emotional-distress claims

on behalf of J.P. as well as on his own behalf. Under Illinois law, intentional infliction of emotional distress requires three elements. "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (cleaned up). To qualify as extreme and outrageous, the alleged conduct "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Id.* at 83.

Here, accepting as true Peoples' allegations that the Oswego Defendants initiated the DCFS investigation—and the ensuing strip search—solely due to retaliatory motivations, as opposed to genuine suspicion of abuse, those allegations reasonably can be characterized as extreme and outrageous conduct. Not only that, Peoples also alleges that J.P. protested against the removal of her clothing, Am. Compl. ¶ 16, and that the event caused her severe emotional distress for which she continues to receive treatment. *Id.* ¶ 22. The Court concludes that Peoples has stated a claim for intentional infliction of emotional distress on behalf of J.P.

As for Peoples' own emotional distress claim, the "conduct" could encompass both the strip search of his daughter as well as personally being subjected to a DCFS report and investigation. Again, taking as true his allegation that neither the calls to DCFS nor the ensuing strip search were rooted in any genuine reasonable suspicion of abuse, Peoples has stated a claim on his own behalf for intentional infliction of

emotional distress. It is plausible, given their alleged retaliatory motives, that the Oswego Defendants intended to cause Peoples emotional distress both by subjecting him to a DCFS investigation and by putting his daughter through a strip search at school.

As explained above, though, it is a different story with Negron. Because Negron did have reasonable suspicion to investigate the child abuse allegations against Peoples, it was not extreme or outrageous for her to conduct the strip search and photograph J.P. afterwards to document that no injuries had been found. So the emotional distress claim against Negron is dismissed.

### D. Intrusion Upon Seclusion (Count 4)

Next, People argues that the "conduct of strip searching Plaintiff, observing her disrobed intimate body areas, and photographing her disrobed intimate body areas" constituted an intrusion upon seclusion. Am. Compl. ¶ 118. The common law tort of intrusion upon seclusion requires "(1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is highly offensive or objectionable to a reasonable person; (3) that the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering." *Jacobson v. CBS Broad., Inc.*, 19 N.E.3d 1165, 1180 (Ill. App. Ct. 2014).

There is no dispute that the strip search and photographing here constituted a highly offensive intrusion into a private matter. And accepting as true Peoples' allegations that the Oswego Defendants instigated the search with no reasonable suspicion or justification, then this claim survives against them. But once again, this

claim against Negron is dismissed, because Negron's conduct was not "unauthorized." As explained above, she conducted the strip search as part of her job as an investigator, and she reasonably relied on child abuse allegations from multiple school employees whom she had no reason to distrust.

### E. Battery (Count 5)

Peoples next alleges that Defendants committed battery against J.P. by making "physical contact of an insulting or provoking nature." Am. Compl. ¶ 142. In order to state a claim for battery under Illinois law, Peoples must allege that the Defendants (1) intended to cause a harmful or offensive contact with J.P., or an imminent apprehension of such a contact, and (2) a harmful contact with J.P. directly or indirectly resulted. *Bakes v. St. Alexius Med. Ctr.*, 955 N.E.2d 78, 85-86 (Ill. App. Ct. 2011). For the same reasons explained earlier, the battery claim survives against the Oswego Defendants but is dismissed for Negron. Accepting Peoples' allegations as true, the suspicionless strip search initiated by the Oswego Defendants constitutes "harmful or offensive contact" against J.P. Negron's contact with J.P., on the other hand, was only made pursuant to an investigation of reasonable allegations of child abuse reported by multiple school employees. So Negron cannot be said to have committed an "offensive" contact.

### F. False Imprisonment (Count 6)

Finally, Peoples alleges that the Defendants detained J.P. "without reasonable grounds to believe [she] committed any offense." Am. Compl. ¶ 166. In order to state a false-imprisonment claim on behalf of J.P., Peoples "must prove both that (1) her

personal freedom was curtailed against her wishes and (2) her detention was unreasonable or unlawful." *Irvin v. S. Ill. Healthcare*, 128 N.E.3d 1149, 1158 (Ill. App. Ct. 2019). To be clear, this claim only targets the detention of J.P. in the school bathroom on January 30; it does not cover the subsequent strip search.

Several other courts in this District have dismissed similar false-imprisonment claims on the basis that students generally "cannot show that they were unlawfully restrained in school because they do not possess freedom of movement within a school." *S.J. v. Perspectives Charter Sch.*, 685 F. Supp. 2d 847, 861 (N.D. Ill. 2010) (cleaned up). *See also Wordlow v. Chi. Bd. of Educ.*, 2018 WL 6171792, at *12 (N.D. Ill. Nov. 26, 2018); *Rogers ex rel. Rogers v. Cook*, 2008 WL 5387642, at *3 (N.D. Ill. Dec. 23, 2008). But it does not appear that Illinois state courts have actually decided this issue, and in this Court's view, the fact that students may have curtailed rights of movement on school *grounds* does not mean they have absolutely no protection at all when detained in particular areas of the school. The concern with allowing false-imprisonment claims to proceed against in-school detentions is that every student who is sent to the principal's office on allegations that are later discovered to be unfounded might end up having a tort claim against the school. But this is not that case. As explained earlier, accepting Peoples' allegations as true, the Oswego Defendants in this case detained J.P. in a school bathroom for purposes of conducting a strip search—all to retaliate against her father. That is a very specific confinement of a very specific nature and does not raise the specter of endless principal-office or detention-hall lawsuits. On that limited rationale, the false-imprisonment claims

survive for now against the Oswego Defendants. Negron, on the other hand, was reasonably investigating an allegation of potential child abuse communicated to her by multiple school employees, so the claim against her is dismissed.

## IV. Conclusion

To sum up, the claims against the Board of Education and DCFS are dismissed completely. So are the claims against Negron. All of these dismissals are without prejudice given the relatively early stage of the case. The claims against Meyers, Simmons, Nelson, and Gonzalez, however, survive for now. If Peoples is going to propose a Second Amended Complaint, then he must do so by April 24, 2020. In any event, discovery against the individual Oswego Defendants must get going, so the Oswego Defendants must answer the current complaint by April 24, 2020, and the parties shall confer on a discovery schedule separate from the Mandatory Initial Discovery disclosures (which are due 30 days after the answer). The status hearing of April 1, 2020 is reset to April 28, 2020, at 11 a.m.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: March 22, 2020